**COMMONWEALTH of Pennsylvania**

v.

**Michael T. TOBIN, Jr., Appellant.**

Commonwealth Court of Pennsylvania.

Argued April 2, 2003.

Decided June 25, 2003.

---

Stephen P. Ellwood, Pottsville, for appellant.

Thomas J. Pellish, Pottsville, for appellee.

BEFORE: LEADBETTER, Judge, and COHN, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge COHN.

This is an appeal by Michael T. Tobin, Jr. from an order of the Court of Common Pleas of Schuylkill County that found him guilty of violating Ordinance 176 (Ordinance) of the City of Pottsville (City) and directed that he pay fines and restitution.

The Ordinance was adopted in 1998 and requires owners of real estate leased to others for residential purposes to submit that real estate to inspections and to pay a fee for the inspections ($25 for the first three rental units and $15 for all other units owned by that landlord). Each apartment is to be inspected every three years, pursuant to the inspection schedule in the Ordinance, which divides the City into five districts. The purpose of the inspection is to determine whether the building is compliant with various City code provisions relating to health and safety.

Tobin owns numerous apartments that he rents to others for residential purposes. Beginning in July 2001, the City's code enforcement officer sent him notices that his buildings within district three, as designated by the Ordinance, were to be inspected and advised him of what fees were owed. Tobin refused both to pay the fees and to submit to the inspections, unless search warrants were obtained. He received a summary citation, which specifically charged him as follows: "Property owner failed to provide access for required rental property inspection." He was convicted by the district justice. On appeal, he was again convicted by the common pleas court. His appeal to this Court followed.[1]

Before this Court Tobin contends (1) that the Ordinance, which he asserts criminalizes a landlord's refusal to permit warrantless entry, is unconstitutional, (2) that the fee charged for inspections is actually an invalid tax, (3) that inspectors are required to be licensed, but, in fact, are not, and (4) that the Ordinance violates equal protection. We will deal with these issues seriately.

## I

## FOURTH AMENDMENT/WARRANT REQUIREMENT

The Ordinance contains the following relevant provisions:

C. Failure of the owner to permit access to conduct ... inspection[s] shall be deemed a violation of this article.

D. For the purpose of enforcing this article, the Code Enforcement Officer or designee may seek to obtain a search warrant issued by a competent authority for the purpose of compelling an inspection for a residential unit.

(Section 176–10 C, D.)

The penalties established in the Ordinance are, in addition to the costs of prosecution, a $300 fine or 30 days in prison or

---

1. Our standard of review is limited to determining whether the trial court abused its discretion, rendered a decision with lack of supporting evidence, or clearly erred as a matter of law. *Commonwealth v. Sprock*, 795 A.2d 1100, 1102 n. 4 (Pa.Cmwlth.2002).

both for a first violation, a $600 fine or 60 days in prison or both for a second violation, and, a $1,000 fine or 90 days in prison or both for a third and subsequent violations. § 176–20 A.

■ First, we note that it is undisputed that the City did not obtain a warrant, although Section 10 D clearly provides that one *may* be sought. The inquiry is, thus, whether Tobin can be criminally convicted for refusing to allow a code enforcement inspector access to the residential apartments he owns and leases in the absence of a search warrant.

■ We begin our analysis with a review of basic constitutional law concerning searches. The purpose of the Fourth Amendment[2] is to protect individual privacy rights from government intrusion. *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). However, privacy interests are constitutionally protected only if they are legitimate. *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (plurality opinion). A businessman has a legitimate privacy right in his commercial property and, indeed, the High Court has specifically stated that such interests extend not only to one's residence, but:

> The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unrea-

sonable official entries upon his private commercial property. The businessman, too, has that right placed in jeopardy if the decision to enter and inspect for violation of regulatory laws can be made and enforced by the inspector in the field without official authority evidenced by a warrant.

*See v. City of Seattle*, 387 U.S. 541, 543, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967).[3] Thus, the Fourth Amendment operates to protect privacy interests by prohibiting nonconsensual searches without a warrant. Issuance of a warrant, in turn, requires probable cause. *Veronia School District 47J v. Acton*, 515 U.S. 646, 653, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

■ There are two types of search warrants: (1) a general search warrant, which allows law enforcement officials to search for the fruits or instrumentalities of a crime, is issued by a court and is attendant to suspected criminal activity; and (2) an administrative search warrant, which allows a municipal official's inspection of premises to ensure compliance with various municipal codes, *i.e.*, construction codes, fire codes. *Camara.* These administrative warrants "may but do not necessarily have to be issued by courts'...." *Griffin v. Wisconsin*, 483 U.S. 868, 877, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). They may be issued by neutral magistrates or neutral officers. *Id.* at 877 n. 5,

---

2. The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Our state constitution similarly provides:

The people shall be secure in their persons, houses, papers and possessions from

unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

(PA. CONST. Art. I, Section 8.)

3. In *See* the landlord of a business premises was convicted for refusing to allow a warrantless routine search of his locked warehouse in accordance with a city-wide inspection conducted by a fire inspector.

107 S.Ct. 3164. While probable cause is required for both types of warrants, for the administrative search warrant, probable cause exists if "reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." *Camara*, 387 U.S. at 538, 87 S.Ct. 1727. Relevant factors for evaluating probable cause are the passage of time since a prior inspection, the condition of the premises, and the condition of the general area. *Camara.* Another basis for finding probable cause to support the issuance of an administrative search warrant is the presence of a general administrative plan for enforcement of the ordinance, which is "derived from neutral sources." *Marshall v. Barlow's Inc.*, 436 U.S. 307, 321, 98 S.Ct. 1816, 56

L.Ed.2d 305 (1978). In evaluating the various factors, however, reasonableness is still the ultimate standard and it is assessed by balancing the need to search against the level of invasion the search entails. *Id.*

However, in the case *sub judice*, no warrant was sought or obtained; Tobin was convicted for refusing to permit the *warrantless* search of his apartments. We must, therefore, review the exceptions to the warrant requirement to determine whether a search could be constitutionally conducted without a warrant.

The City does not argue that there were exigent circumstances present here (such as a fire),[4] nor does it argue that the warrant requirement is excused because of "special needs."[5] Rather, the City argues

---

4. In *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), firefighters, who had entered a furniture store to extinguish a burning blaze, could seize evidence of arson that was in plain view. They were also permitted to continue a post fire, warrantless search that was begun as the last of the flames were being doused, but could not be completed due to smoke and darkness. The further search was allowed because it was viewed as a "continuation" of the initial search. In a factually similar case, however, which involved a private residence, and where arson investigators returned six hours after the fire had been extinguished and the occupants of the home had begun to take steps to secure their privacy interests by boarding up the house and pumping out the basement, subsequent searches by an arson investigator, without obtaining a warrant, violated the Fourth Amendment. *Michigan v. Clifford*, 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984).

5. For example, in *Griffin*, a state regulation that permitted probation officers to conduct warrantless searches of the homes of those on probation withstood Fourth Amendment scrutiny. The Court there recognized, *inter alia*, that a warrant requirement would make it more difficult for probation officers to respond to evidence of misconduct, would deter the supervisory arrangement attendant to probation, and would merely substitute the judg-

ment of a magistrate for that of the probation officer as to how closely the probationer needs to be supervised. And, in *T.L.O*, the Court held that a warrantless search of a student's purse was constitutionally permissible where school officials had a reasonable suspicion that she had violated the school's no smoking rule. It stated:

> The warrant requirement, in particular, is unsuited to the school environment: requiring a teacher to obtain a warrant before searching a child suspected of an infraction of school rules (or of the criminal law) would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools.

*Id.* at 340, 105 S.Ct. 733; *accord Vernonia School District 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (Court considered the question of whether the school district's requirement that student athletes submit to drug testing, for which students and parents had to sign consent forms, violated the prohibition against unreasonable searches; noting, *inter alia*, the custodial and tutelary nature of their relationship with school officials, the high degree of supervision, which would not be attendant to the typical adult, and the routine requirement that students submit to various physical examinations, it concluded that the drug testing policy did not run afoul of the Fourth Amendment).

that a warrant is not required because the search involves an industry that is "closely" or "pervasively" regulated. *New York v. Burger,* 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987).

■ The courts, in discussing this warrant exception, have found that a business person legitimately has a reduced expectation of privacy in an industry that has historically been subject to intense government regulation, and that these factors obviate the need for a warrant. *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970); *see also Marshall; Rush v. Obledo,* 756 F.2d 713 (9th Cir.1985). In an excellent analysis of the High Court's case law concerning this pervasively regulated industry exception, the *Rush* Court wrote:

> The central difference between the *Colonnade–Biswell* line of cases and those in which warrantless administrative searches have been found unreasonable so as to violate the Fourth Amendment has been the type of regulation involved. Persons successfully protesting warrantless searches were not engaged in any regulated or licensed businesses, but were subjected to such searches pursuant to general regulatory schemes which indiscriminately covered many different businesses or covered conditions in private residences or automobiles.

*Rush,* 756 F.2d at 718. To fall within the *Colonnade–Biswell* exception, the industry in question must be subject to pervasive regulation that is not part of a general and indiscriminate regulatory scheme. *Id.* For example, in *Colonnade,* a warrantless search of a catering corporation that, *inter alia,* sold liquor was permitted by federal agents who suspected violations of the federal tax excise law. The Court upheld the search on the theory that there has been a long history of regulation of the liquor industry, and also observed that Congress had made it a criminal offense to refuse admission to federal inspectors. And, in *Biswell,* the Court upheld the warrantless search of a pawnshop that was licensed to deal in sporting weapons, noting that the firearms industry is a pervasively regulated one under federal gun control legislation. Finally, in *Donovan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981), the High Court, in reviewing the constitutionality of a warrantless re-inspection of a stone quarry, after a previous inspection had found twenty-five code violations, relied, again, on the federally pervasive regulation of the mining industry, as well as on the presence of a regulatory scheme for periodic inspections and follow up inspections where violations had been found. In contrast, the Court in *Marshall* did not sanction a warrantless search of an electrical and plumbing installation business by an OSHA inspector. *Marshall* distinguished the *Colonnade–Biswell* cases as follows:

> Industries such as these fall within the "certain carefully defined classes of cases," referenced in *Camara,* 387 U.S. at 528, 87 S.Ct. 1727. The element that distinguishes these enterprises from ordinary businesses is a long tradition of close government supervision, of which any person who chooses to enter such a business must already be aware. "A central difference between those cases [*Colonnade* and *Biswell*] and this one is that businessmen engaged in such federally licensed and regulated enterprises accept the burdens as well as the benefits of their trade.... The businessman in a regulated industry in effect consents to the restrictions placed upon him."

*Id.* at 313, 98 S.Ct. 1816 (quoting from *Almeida–Sanchez v. United States,* 413 U.S. 266, 271, 93 S.Ct. 2535, 37 L.Ed.2d

596 (1973)). We must decide whether the matter *sub judice* is closer to *Marshall* or to those cases involving a business or industry determined to be pervasively regulated.

In this case, the City does not cite to any regulations, licensing or registration requirements for residential rental property that would illustrate a pervasive regulatory scheme. The only regulations are the local building and BOCA[6] codes, which apply generally to all real estate.[7]

At oral argument, the City expressed its concern that the necessity of obtaining search warrants will make it virtually impossible to check for code enforcement violations. It argued that, because no criminal activity is suspected, it will not be possible to show "probable cause" related to any criminal activity. In the *Camara* case, these and similar arguments were addressed by the United States Supreme Court.

In *Camara*, a lessee sought to enjoin criminal proceedings brought against him because he failed to permit a warrantless search of his apartment by a city building inspector. The state trial and appellate courts denied relief. The High Court reversed. In so doing, it described administrative warrants and specifically overruled an earlier opinion of the Court, *Frank v. Maryland*, 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959), after explaining, and then rejecting, the arguments that the *Frank* Court had found persuasive. Interestingly, the arguments advanced in *Frank* are the same or similar to those the City asserted here.

The Supreme Court noted that the *Frank* Court had observed that municipal inspections "touch at most upon the periphery" of the interest of being safeguarded from official intrusion, *Frank*, 359 U.S. at 367, 79 S.Ct. 804 because the purpose of the inspections is only to determine if physical conditions exist that do not comply with local regulatory ordinances. The *Camara* Court agreed that routine inspections may be less hostile intrusions than when the police are searching for the fruits of a crime, but that it was anomalous to conclude, as the *Frank* Court had done, that one is fully protected under the Fourth Amendment only where he is suspected of criminal behavior. It noted, *inter alia*, that if code violations are, in fact, found, they can lead to criminal charges. The *Camara* Court also noted that *Frank* had been influenced by the notion that the public interest demands warrantless administrative searches. Distinguishing between the need for a search and the need for a *warrantless* search, the Court stated that nowhere had it been argued that the aims of code inspectors could not be met "within the confines of a reasonable search warrant requirement." *Camara*, 387 U.S. at 533, 87 S.Ct. 1727.

Recognizing that the inquiry did not end with the determination that a warrant was

6. The BOCA National Building Code/1999 § 101.2 (14th ed.1998), provides as follows:

   **Scope:** These regulations shall control all matters concerning the construction, alteration, addition, repair, removal, demolition, location, occupancy and maintenance of all buildings and structures, and shall apply to existing or proposed buildings and structures, except as such matters are otherwise provided for in other ordinances or statutes, or in the rules and regulations autho-

   rized for promulgation under the provisions of this code.
   (Emphasis omitted.)

7. Although not cited to us, we have also reviewed The Landlord and Tenant Act of 1951, Act of April 6, 1951, P.L. 69, *as amended*, 68 P.S. §§ 250–101–250–510B, and it does not provide a pervasive regulatory framework. The focus of that law is on the right of landlords to recover possession and rental fees owed.

required for administrative searches, the Court, in *Camara*, then went on to decide that a municipal inspector, in order to obtain a warrant, did *not* need to show probable cause to believe that the dwelling contained violations of the minimum code standards. It focused on the nature of the governmental interest, which it found was the prevention of any unintentional development of conditions that would be hazardous to public health or safety, such as fires or epidemics, as well as blighted conditions that adversely affect economic values. Next, it reasoned that, because an agency's decision to conduct an area inspection is based on conditions in the area as a whole, the "criminal" probable cause standard asserted by the appellant was unworkable and would result in area inspections being eliminated, dealing a "crushing blow" to the goals of code enforcement. Relying on the long history of judicial and public acceptance of inspection programs, the public interest in preventing and abating dangerous conditions, and the impersonal nature of the search, which does not seek to "discover a crime," it held, as we noted earlier in this opinion, that probable cause to issue an administrative search warrant exists if "reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." *Id.* at 538, 87 S.Ct. 1727. We, too, must determine "probable cause" within this context.

In applying *Camara* to the case *sub judice*, we note, initially, that the Ordinance itself contains a general inspection schedule established by clearly identified districts, together with a "minimum standards checklist" derived from the BOCA Code. We, thus, conclude that the City has established a general administrative plan "derived from neutral sources," in accordance with *Marshall*. In addition, because municipal officials need not suspect any criminal wrongdoing to obtain a warrant, and because the issuance of the warrant need not be by a judge, the City here does not have a burden any more onerous than the one placed on municipal inspectors in *Camara* or *See*. In short, the Ordinance complies with the case law's "neutral sources" requirement; therefore, obtaining an administrative warrant should be a matter of routine.

We note that our decision today is also in accord with *Simpson v. City of New Castle*, 740 A.2d 287 (Pa.Cmwlth.1999), upon which the City relies, because there, too, an ordinance authorizing administrative searches was upheld. However, the procedural posture there was much different from in this case. In *Simpson*, the City of New Castle had passed an ordinance requiring landlords to register any rental properties owned by them with the city and to submit to biennial mandatory inspections, pay a fee and obtain permits to rent the property. The ordinance also contained penalty provisions and adopted the BOCA Code. Simpson, who was a landlord, filed a complaint in equity seeking to enjoin the city from enforcing the provisions alleging, *inter alia*, (1) that they violated his right to freedom from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution and Article I, Section 4 of the Pennsylvania Constitution and (2) that the fees imposed resulted in a double taxation on him as a landlord, since he already pays an occupational tax. The trial court denied the request for preliminary injunction and, on appeal, we affirmed.

Regarding the search issue, we noted that, while the ordinance did provide for inspections, an owner could simply refuse to allow for the inspection and choose not to rent the property. We, thus, stated that the prohibition against illegal searches was not implicated. Additionally, we not-

ed that the BOCA Code, itself, provided that, absent an owner's consent to search, a warrant must be obtained. We relied on Section PM–105.3 of the BOCA Code, which states that "[i]f entry is refused, or not obtained, the code official is authorized to pursue recourse as provided by law." We explained that "recourse provided by law," means that it is the responsibility of the administrative officials to seek a warrant where the search is to determine whether there are any specific violations of the code.[8] We further opined in *Simpson* that, "[b]ecause Section PM–105.3 [of the code] imposes on code officials the requirement to inspect, subject to constitutional restrictions, it is adequate protection against unreasonable searches and seizures as protected by the Fourth Amendment to the United States Constitution and Article One, Section Eight of the Pennsylvania Constitution." *Simpson*, 740 A.2d at 291.

■ Unlike the situation in *Simpson*, where the landlord launched a preemptive strike by seeking to enjoin the enforcement of the ordinance, the procedural posture here is that the landlord has been *convicted* for violating the Ordinance and is challenging that conviction. In *Simpson*, a civil lawsuit, we held that absent consent to search, a warrant was required. Certainly, in this case, where Tobin has been *criminally convicted*, we can require no less. Therefore, we hold that,

under *Camara* and *Simpson*, the conviction cannot stand. To allow it to stand would be to convict Tobin for exercising his constitutional right under the Fourth Amendment. We hasten to add that our holding here does not, in any way, compromise the facial efficacy of the Ordinance. The Ordinance does provide for the officials to obtain a warrant. It clearly states, "For the purpose of enforcing this article, the Code Enforcement Officer or designee may seek to obtain a search warrant issued by a competent authority for the purpose of compelling an inspection for a residential unit." (176–10 D.) Furthermore, we interpret Section C of the Ordinance to state that a violation of the Ordinance occurs where the owner fails to permit access to conduct a legal inspection, *i.e.*, either where there is a voluntary consent to the search or where an administrative warrant is obtained.[9] On this basis, although we reverse Tobin's conviction, we uphold the Ordinance.

## II

### FEE AS INVALID TAX

■ Tobin's second argument is that the City's fee is an invalid tax on the owners of residential rental property. He asserts that the fee is not paid for purposes limited to the inspection, but defrays the cost of the entire enforcement office and is therefore a tax, not a fee. An administrative fee may be charged to de-

---

8. To the extent *Simpson* may suggest that the probable cause requirement for administrative warrants for routine inspections might be more stringent than that enunciated in *Camara*, *Camara* is controlling, since the United States Supreme Court is the ultimate authority for interpreting the United States Constitution.

9. Our reading of the Ordinance is in accord with principles of statutory construction, which have been applied to ordinances as well. *See, e.g., Ramsey v. Zoning Hearing*

*Board of the Borough of Dormont*, 77 Pa. Cmwlth. 456, 466 A.2d 267 (1983). In particular, we are guided there by the presumption that the legislating body does not intend to violate the Constitution. Section 1922(3) of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1922(3). Additionally, where legislation is susceptible to two constructions, one of which would be constitutional and the other which would not, we are directed to adopt the constitutional one. *Ramsey.*

fray the cost of inspections. *Greenacres Apartments, Inc. v. Bristol Township*, 85 Pa.Cmwlth. 572, 482 A.2d 1356 (1984); *Simpson.* But, such a fee cannot be a revenue raising measure or it is an invalid tax. *Greenacres.* As was stated there:

A licensing fee, of course, is a charge which is imposed pursuant to a sovereign's police power for the privilege of performing certain acts, and which is intended to defray the expense of regulation. It is to be distinguished from a tax, or revenue producing measure, which is characterized by the production of large income and a high proportion of income relative to the costs of collection and supervision.

*Id.* at 1359. In *Greenacres*, the rental corporation put on evidence to try to demonstrate a disparity between fees collected and enforcement costs; however, it did not prevail because it did not show a high proportion of income relative to the administrative costs. In the case *sub judice* there was, quite simply, no evidence that the fee is for revenue-raising purposes, rather than to defer administrative enforcement costs. We, thus, conclude that Tobin has failed to show an unconstitutional tax.

### III

### LICENSING REQUIREMENT FOR INSPECTORS

■ Tobin next maintains that the inspectors must be licensed, relying, for his sole authority, on the fact that the Department of Labor and Industry requires persons inspecting under the BOCA Code and the International Residence Code to be certified. Tobin concedes that those codes are not the basis for enforcement here but, nonetheless, asserts that since the City

code is similar, certification *should* be required. Whether such a requirement is advisable is a matter within the discretion of City authorities to decide, not this Court. Since it is admitted that there is no statutory, regulatory or constitutional mandate that such licensing be required, we can not impose such an obligation on the City.

### IV

### EQUAL PROTECTION

■ Finally, *Tobin* asserts that the distinction drawn between tenant-occupied real property and all other real estate violates equal protection,[10] asserting that the danger to the public is the same irrespective of the nature of the building. A similar argument was made in the *Greenacres* case, where hotels and motels were exempt from inspections required of rental apartments. In that case, Judge Blatt correctly recognized that:

Inasmuch as there is no fundamental right at stake and the challenged classification is not inherently suspect, the appropriate standard of review is, of course, the "rational basis" test under which the challenged classification must be sustained if it bears a rational relationship to a legitimate government interest, and any state of facts may reasonably be conceived to justify it.

*Id.* (citing *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1218, 6 L.Ed.2d 393 (1961)). In this instance, it is certainly rational to conclude that persons who rent may not have the financial wherewithal to have their leased residence inspected to assure compliance with code requirements before renting. Moreover, because people live and sleep in apartments with pets and children, it is rational to conclude that

---

**10.** The Fourteenth Amendment to the United States Constitution pertinently states that "No

State shall ... deny to any person within its jurisdiction the equal protection of the laws."

there is a greater danger than with a commercial property that a problem that goes undetected could result in loss of life. We, therefore, conclude that there is a rational basis for the inspection of leased residential premises.

## CONCLUSION

Based on the foregoing discussion, we sustain the facial constitutionality of the Ordinance, and hold that an administrative warrant must be obtained prior to convicting an owner for failing to permit access to conduct inspections under the Ordinance. Because no warrant was issued, Tobin's conviction violated his Fourth Amendment right to be free from unreasonable warrantless searches. For this reason, the order of the common pleas court is reversed.

## *ORDER*

**NOW,** June 25, 2003, the order of the Court of Common Pleas of Schuylkill County in the above-captioned matter is hereby reversed.

Senior Judge McCLOSKEY dissents.